In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-3830 and 07-3831

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WALTER J. FOX AND RODNEY SYKES,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 07-CR-101-S—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 9, 2008—DECIDED NOVEMBER 14, 2008

Before BAUER, CUDAHY, and WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Rodney Sykes and Walter Fox pleaded guilty to conspiracy to distribute and to possess with intent to distribute crack cocaine. Each disagrees with the application of the Sentencing Guidelines to the facts of his case and contends that his sentence is unreasonable. Sykes argues that the district court improperly increased his base offense level on the basis that he was an organizer of the offense, and Fox contends that the drug quantity for which he was responsible

was miscalculated. We find that Sykes is entitled only to a limited remand under *Kimbrough v. United States*, 128 S. Ct. 558, 564, 169 L. Ed. 2d 481 (2007), but that Fox's sentence must be vacated and remanded for reconsideration of the applicable drug quantity.[1]

## I. Background

### A. Facts

The appellants, Rodney Sykes and Walter Fox, are self-described crack cocaine addicts who bought, sold and used drugs together. They spent a lot of their time getting high at Sykes's house. At some point, Sykes, Fox and their co-defendant James Sanderson attracted the attention of the authorities and became targets of an investigation.

On June 1, 2007, an undercover officer (the UO) made arrangements to purchase crack cocaine from Sykes. Sykes met the UO at a designated location and sold her 2.541 grams of crack cocaine for $150. On June 6, the UO made arrangements to purchase more crack cocaine from Sykes. While the UO was waiting at the designated location, Sykes called her and asked her to meet him at a gas station. There, the UO met Sykes and an unknown associate; the associate sold her 4.743 grams of crack cocaine for $300.

The UO again made arrangements with Sykes to purchase crack cocaine on June 13, 2007. Police officers ob-

---

[1] This court has jurisdiction over the appeal pursuant to 28 U.S.C. §§ 1291, 1294 and 18 U.S.C. § 3742(a).

served Fox leave Sykes's residence and travel to the designated location. Fox sold the UO one "eight-ball"[2] of crack cocaine for $150. The UO asked Fox if he had the other eight-ball that the UO had requested. Fox did not, but he agreed to retrieve it. The police officers observed Fox travel back to Sykes's house and then return to the designated location where the UO was waiting. Fox then provided the UO with the second eight-ball. The combined weight of the two eight-balls was 4.138 grams.

On June 22, the UO once again made arrangements with Sykes to purchase crack cocaine. This time James Sanderson met the UO at the designated location and sold her 5.886 grams for $450.

Finally, on June 27, investigators executed a search warrant at Sykes's residence. They found 40 grams of crack cocaine and other items indicative of the use and sale of drugs. Sykes was arrested and gave a statement to the police.

### B. Procedural History

On June 27, 2007, the grand jury returned a six-count indictment against Sykes, Fox and Sanderson. Count One charged all three men with conspiracy to distribute and to possess with intent to distribute five grams or more of crack cocaine from on or about June 1, 2007 to on or about

---

[2] An "eight-ball" is typically one eighth of an ounce of crack cocaine, or 3.5 grams.

June 22, 2007. Sykes and Fox pleaded guilty to Count One of the indictment on September 12, 2007 pursuant to written plea agreements. Sanderson did not plead guilty at that time; instead, when the present case was appealed, his case was still active in the district court.

In Sykes's Presentence Investigation Report (PSR), the probation officer recommended a two point upward adjustment to his offense level for his role in the offense "because [Sykes] instructed Mr. Fox and Mr. Sanderson on the delivery of cocaine." Sykes objected to the application of this adjustment and argued that it was based on an incomplete summary of his post-arrest statement to investigators.

Sykes acknowledged that in his statement he said that officers would find marijuana and crack cocaine in their search of his residence, that any drugs located in his residence belonged to him, that he had been selling drugs for approximately four or five months, that he sold drugs to make money to buy more drugs, that he usually obtained an ounce to an ounce and a half of drugs every two or three days and that he sold the majority of them but smoked about a quarter to a half ounce per day with Fox and Sanderson. In support of his objection to the enhancement for his role in the offense, Sykes submitted an extended excerpt from the statement, in which he gave the following answers to questions:

> **Detective Linsmeier**: How often did you have Jamie [Sanderson] and Walt [Fox] running dope for you?
>
> **Sykes**: Running dope for me?

**Detective Linsmeier**: Yeah, delivering dope for you.

**Sykes**: Walter don't deliver no dope for me. Walt don't deliver no dope at all. He gets high.

**Detective Linsmeier**: You're covering for Walt, Rodney.

**Sykes**: No I'm not. If Walt's delivering dope, he ain't delivering it for me. Now Jamie, he may go and drop something off . . . and they don't be doing it for me, they be doing it for themselves.

**Detective Linsmeier**: So if someone calls you up to order some dope . . .

**Sykes**: I go myself.

**Detective Linsmeier**: Yeah, but what happens if you're not able to?

**Sykes**: Jamie will run it sometimes.

**Detective Linsmeier**: How often does Jamie run it for you?

**Sykes**: Every now and then Jamie would make a run.

**Detective Linsmeier**: How often? How many times a week?

**Sykes**: Maybe three or four times.

**Detective Linsmeier**: A week?

**Sykes**: Yeah.

. . .

**Detective Linsmeier**: Did Walter ever deliver. . .

**Sykes**: If Walter ever delivered, he'd run his own shit. He won't be running for me.

**Detective Chamulak**: So if somebody called you and said "hey, I need something," and you'd say, "Ok, I'll take care of you," but you didn't have it, and then you called somebody else to take care of it?

**Sykes**: Yeah, I'll do that.

**Detective Linsmeier**: So hypothetically someone called you up and said I want whatever, five 8-balls, or whatever, if you don't have it. . .

**Sykes**: Then I'll send them to somebody else.

**Detective Linsmeier**: Who have you sent them to in the past?

**Sykes**: [Fox, Sanderson and others.]

. . .

**Sykes**: Somebody's calling me, I may call Jamie; I may call Walt; I may call somebody and say, uh, somebody want some, you want that? And they be like, "I'll go get it."

**Detective Linsmeier**: Okay, so where did Jamie or Walt get the coke from? Did they get it from you or their own source?

**Sykes**: They already had it. They probably already had their own shit.

**Detective Linsmeier**: From you or from their own source?

**Sykes**: From their own source.

Sykes argued that, when his statement was considered as a whole, it did not support a finding that Fox and Sanderson were delivering drugs on his behalf or that he was a leader or organizer of the activity. He also quoted an exchange between Fox and the district court that occurred during Fox's change of plea hearing:

> **Court**: Mr. Fox, what was your role in the conspiracy? And were you a member of it?
>
> **Fox**: Yes, Your Honor. I was a member according to Count One, and on the 13th [of June, 2007] I did deliver . . . to the young lady that showed up at Wood-man's parking lot who was an undercover. . ..
>
> **Court**: Where did you get that crack? You bought it or just sold it? Who was your source? How did you get it? Who gave it to you? How did you get it for distribution?
>
> **Fox**: Well, I ended up purchasing the crack cocaine.

At Sykes's sentencing, the district court found that he had organized the distribution of crack cocaine and applied the two-point upward adjustment to his offense level. The court noted that it "has read [Sykes's post-arrest statement] on several occasions and finds that you can probably make 15 conclusions out of it, 14 of which do not benefit the defendant and the Court isn't going to take that 15th step." It pointed to the undisputed fact that the undercover officer called Sykes to order crack cocaine and that on at least two occasions the drugs were delivered by someone other than Sykes. On the subject of the June 13, 2007 sale, the court said,

[T]he undercover officer made arrangements to obtain two 8 ball quantities of crack cocaine from the defendant. Mr. Sykes did not refer the officer to Mr. Fox because he was out of cocaine; rather, Fox delivered the drugs after he was observed by law enforcement leaving the defendant's residence. Sykes must have provided the location and description of the customer to Fox; Sykes did, in order to complete the sale. When Fox met with the undercover officer, he did not have the requested amount of drugs. He was observed by law enforcement driving back to defendant's residence, presumably to obtain the additional quantity, immediately return[ing] to the location where the undercover officer was waiting and provid[ing] the additional crack cocaine.

Based on these circumstances, the court concluded that the government had proven by a preponderance of the evidence that Sykes had instructed Fox to deliver crack cocaine at least on June 13, 2007. Later in the hearing, the court reiterated,

A two-level increase pursuant to Section 3B1.1(c) is applicable because the defendant organized the distribution of crack cocaine. Mr. Sykes did that. He did that over a period of time. The evidence clearly shows the defendant arranged to supply an undercover officer crack cocaine on June 13, 2007 and then provided the crack to Fox who made the delivery; at least

that's what Fox apparently is saying.[3] Defendant also directed Fox and Sanderson to other customers . . . .

The court then calculated Sykes's guidelines imprisonment range. It found him to be a career offender under U.S. Sentencing Guidelines Manual [U.S.S.G.] § 4B1.1(a), but, because his adjusted offense level was higher under Chapters 2 and 3 of the guidelines, the court applied this higher offense level. This resulted in an offense level of 33 and a criminal history category of six, which corresponded to a guidelines imprisonment range of 235 to 293 months. The court imposed a sentence of 250 months, based in large part on Sykes's criminal history, which it referred to as "the horrendous amount of crime that this defendant has committed."

In Fox's PSR, the probation officer said he believed "the government can prove by a preponderance of the evidence that [Fox's] relevant conduct involved 44.138 grams of crack cocaine." This included both the 4.138 grams from the June 13, 2007 sale and the 40 grams found in Sykes's residence on June 22, 2007. The probation officer's justification for including the 40 grams from Sykes's residence was that "[Fox] was aware Mr. Sykes

---

[3] The court may have been referring here to a statement Fox made during his debriefing. In Fox's objections to his PSR, he characterized that statement as follows: "Mr. Fox provided detail about [the June 13, 2007 sale] during his debriefing, explaining to police that he wanted to use Mr. Sykes' truck and Sykes would not allow him to do that unless Fox agreed to do the drop off."

stored drugs at this location because he traveled to the residence between controlled buys on June 13, 2007."

Fox objected to the inclusion of the additional 40 grams on the following bases: (1) the record did not support the existence of a conspiracy between Fox and Sykes beyond the one that started and ended on June 13, 2007; (2) there was no evidence that the 40 grams were possessed (a) in furtherance of the jointly undertaken criminal activity and (b) during the commission of the offense of conviction, as required by U.S.S.G. § 1B1.3(a)(1)(B); and (3) the record did not support a conclusion that Fox should have foreseen Sykes's possession of the 40 grams on June 27, 2007.

At Fox's sentencing hearing, after Fox and the government made their arguments on the extent of relevant conduct, the entirety of the court's comments were the following:

> The defendant is responsible for the crack cocaine located at [Sykes's] residence on the date of the search warrant. Sykes provided drug customers to the defendant. Defendant was aware that Sykes stored drugs in his residence. Defendant was observed traveling to that residence to obtain additional crack cocaine on the date he delivered crack cocaine to the undercover officer.
>
> . . .
>
> [Fox] is, as a member of that conspiracy, responsible for the crack cocaine located at the residence of the codefendant Sykes on the day of the search. He was

provided drug customers. He provided them to the defendant. He was aware that Sykes was storing drugs at his residence and was observed traveling to that residence to obtain additional crack cocaine . . . .

The court then calculated Fox's guidelines imprisonment range using the 44.138 grams of crack cocaine and the drug quantity table in U.S.S.G. § 2D1.1(c). This process resulted in an adjusted offense level of 23, which was paired to Fox's criminal history category of one to produce a range of 46 to 57 months. After considering Fox's mitigating personal circumstances, the court imposed a sentence of 46 months' imprisonment.

Sykes and Fox both timely appealed. On September 5, 2008, Sykes submitted a letter to this court citing *United States v. Clanton*, 538 F.3d 652 (7th Cir. 2008), as supplemental authority on the modified crack penalty in support of his entitlement to a remand under *Kimbrough v. United States*, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007).

## II. Discussion

We review a district court's determinations of a defendant's role in the offense under U.S.S.G. § 3B1.1, relevant conduct under U.S.S.G. § 1B1.3 and drug quantity under U.S.S.G. § 2D1.1 for clear error. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007); *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007). We will affirm the district court's decision unless, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been made. *Artley*, 489 F.3d at

821 (citing, *inter alia*, *United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006)).

### A.  Sykes's Role in the Offense

Sykes argues that there was not sufficient evidence in the record to support the district court's finding that he was an organizer of the offense under U.S.S.G. § 3B1.1 and that the evidence cited by the district court was not reliable.[4] We have summarized the evidence relied on by

---

[4]  Section 3B1.1(c), under which Sykes was sentenced, provides the following:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> > If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than [one involving five or more participants], increase by 2 levels.

U.S.S.G. § 3B1.1(c). Application Note 2 thereto says,

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1(c) cmt. n.2. And Application Note 4 says,

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as
>
> (continued...)

the district court. But we may affirm the application of Section 3B1.1 on those grounds or any others that are supported by the record. *Schuh*, 289 F.3d at 973.

The evidence available to the district court included the statements made to law enforcement by Sykes and Fox: Sykes's post-arrest statement, Fox's statement during his plea hearing and Fox's representations to the court in his objections to his PSR. These statements were inconsistent on the issue whether Fox and Sanderson delivered drugs on Sykes's behalf. The district court appears to have made credibility findings with respect to these statements, sifting and winnowing the true from the questionable. The court found that the bulk of Sykes's statement supported application of the adjustment, and that Fox's statements provided additional support in that they showed that Fox made deliveries for Sykes. A district court's findings on witness

---

(...continued)

> "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1(c) cmt. n.4.

credibility (even when only implied) are entitled to great, although not absolute, deference. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985).[5] Here, despite obvious conflicts in the statements, it was not clear error for the district court to find that the statements of Sykes and Fox supported the conclusion that Sykes was providing direction for Fox and Sanderson, and that conclusion supports the application of the adjustment.

In addition, there was circumstantial evidence relating to the drug sales on which to rely. On at least two occasions, the UO called Sykes to order crack cocaine, Sykes agreed to make the sale and Sykes and the UO determined a time and location for the sale, but someone other than Sykes showed up to make the exchange. On June 13, 2007, Fox appeared to make the sale, was apparently unaware that the deal was for two eight-balls and went back to Sykes's residence to pick up the other eight-ball. One could make inferences from these circumstances that would not support the application of Section 3B1.1, but

[5] In *Anderson*, the Court explained, "the trial judge may [not] insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Id*. at 575.

one not implausible inference is that Sykes was directing his acquaintances, and it was not clear error for the district court to make that inference.

Sykes argues that acting as a middleman or a narcotics broker is alone insufficient to support an adjustment under Section 3B1.1, citing *United States v. Reneslacis*, 349 F.3d 412, 417 (7th Cir. 2003), and *United States v. Schuh*, 289 F.3d 968, 973 (7th Cir. 2002). Those cases were clarified in *United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008), when the court said, "while we examine all of the factors, we emphasize both relative responsibility and control over other participants, and recognize that middleman status is not necessarily inconsistent with being a manager or supervisor."[6]

There is more evidence here to support an organizer adjustment than there was in *United States v. Mustread*, 42 F.3d 1097, 1100-01 (7th Cir. 1994), one of the cases Sykes cites in support of his argument that he did not have more control over the offense than did Fox or Sander-

---

[6] Moreover, the present case is distinguishable from *Schuh* because in that case, "there was no evidence that [the defendant] organized, led, or in any way controlled the [drug dealers]. . . . [A]cting as a 'middleman' by directing customers to dealers is insufficient for a § 3B1.1 adjustment. . . . [The defendant] did not supply the cocaine to the dealers or control who sold it, when they sold it, at what price they sold it, how they acquired it, how much or to whom they sold, what type they sold, or how many dealers could sell at [his bar] at any given time." 289 F.3d at 973. Here, the district court found that Sykes was more than just a middleman and that he did exercise control over his codefendants.

son. In *Mustread*, the only evidence that supported the district court's application of Section 3B1.1 was the fact that in one instance, the defendant asked a friend's drug "mule" to transport drugs for him. The mule agreed to do so only after asking permission from his boss (the defendant's friend). *Id.* This court found that evidence to be insufficient to support a leadership adjustment to the defendant's sentence and therefore that the district court clearly erred in applying Section 3B1.1. *Id.* at 1104-05. The court said,

> [W]e have recognized that a key inquiry, though not the only inquiry, is whether the defendant exercised some control over at least one other participant. That does not mean that others must have played marionette to the defendant's puppeteer. For these purposes, to control another the defendant may simply have organized or in some way directed him. But however control is defined, Mustread lacked adequate control over any other participant . . . . Mustread's actions do not fit the rest of the seven-part framework, either.

*Id.* at 1104 (citations omitted).

Sykes cites cases for the proposition that he has a due process right to be sentenced on the basis of reliable information, and "the hallmark of reliability is consistency of facts and details." *United States v. Johnson*, 489 F.3d 794, 798 (7th Cir. 2007) (quoting *United States v. Zehm*, 217 F.3d 506, 514 (7th Cir. 2000); *United States v. Galbraith*, 200 F.3d 1006, 1012 (7th Cir. 2000)). The mere existence of an inconsistency, however, especially in the defendant's

own statement, cannot fully thwart the court's reliance on such a statement. In the present case, Sykes's admission that Sanderson sometimes delivered for him was corroborated by the fact that Sanderson was observed making a sale (the June 22, 2007 sale) that was originally arranged by Sykes. The district court did not clearly err in adjusting Sykes's offense level based on his supervisory role.

### B.  Fox's Relevant Conduct

As noted, the district court found that the 40 grams of crack cocaine found in Sykes's residence were part of Fox's relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). It therefore included that amount in applying the drug quantity table in Section 2D1.1(c) to determine Fox's base offense level. Fox has repeatedly objected to this inclusion but his objections have thus far fallen on deaf ears. He now asks us to vacate his sentence, arguing that the government, the PSR and the district court focused exclusively on the foreseeability requirement of relevant conduct, ignoring its other requisites, and that in any event, the record did not support the inclusion. For the following reasons, we agree with Fox.[7]

---

[7] The relevant conduct section of the Sentencing Guidelines provides as follows:

> (a) [Relevant conduct] shall be determined on the basis of the following:

(continued...)

---

[7] (...continued)

. . .

(1)(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), *all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity*,

*that occurred during the commission of the offense of conviction*, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added). And relevant excerpts from Application Note 2 say,

In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was *both*:

(i) in furtherance of the jointly undertaken criminal activity; and

(ii) reasonably foreseeable in connection with that criminal activity.

Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") *is not necessarily the same as the scope of the entire conspiracy*, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court *must first determine the scope of the criminal activity*

(continued...)

---

[7] (...continued)

*the particular defendant agreed to jointly undertake* (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was *both* in furtherance of, *and* reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, *or* was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

. . . .

U.S.S.G. § 1B1.3 cmt. n.2 (emphasis added).

One of the provided illustrations demonstrates this point:

Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. Defendant J is accountable for the entire single shipment of marihuana he helped import under subsection (a)(1)(A) and any acts and omissions in furtherance of the importation of that shipment that were reasonably foreseeable (see the discussion in example (a)(1) above). He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I because those acts were not in furtherance of his jointly undertaken criminal activity (the importation of the single shipment of marihuana).

U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(3).

Fox first contends that the district court neglected to first determine the scope of the criminal activity that he agreed to jointly undertake, as is preliminarily required. In response, the government—as it did just recently in *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008)—suggests that it was not required to demonstrate the scope of Fox's jointly undertaken criminal activity because he pleaded guilty to conspiracy. But, as we noted in *Soto-Piedra*, that proposition is insupportable; Section 1B1.3 was amended in 1992 specifically to disavow it. *Id*. "Conspiracy liability, as defined in *Pinkerton v. United States*, 328 U.S. 640, 646-48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), is generally much broader than jointly undertaken criminal activity under § 1B1.3." *Id*.

Second, Fox contends that the district court did not consider whether Sykes's possession of the 40 grams was in furtherance of any joint criminal activity involving Fox and Sykes. The only significant facts in the record involving the joint criminal activity between the two men are Fox's participation in the June 13, 2007 deal and the agreed fact that Fox was a crack addict who spent time at Sykes's residence getting high. It is impossible for us to tell from this record whether Sykes's possession of 40 grams of crack cocaine on June 27, 2007 was in furtherance of any joint criminal activity involving him and Fox.

Third, Fox points out that neither the government, nor the PSR, nor the district court addressed the fact that the 40 grams of crack cocaine was found in Sykes's residence on June 27, 2007, five days after the end of the charged conspiracy between the men. This circumstance is not

dispositive, but it should be considered in the totality of the circumstances. For example, there is evidence in the record that suggests that this particular 40 grams was probably not possessed by Sykes during the charged conspiracy: Sykes testified that he typically obtained an ounce to an ounce and a half every two to three days, and therefore it is at least possible that the 40 grams he possessed on June 27 was acquired after June 22 (the end of the charged conspiracy).

The court did consider whether Sykes's possession was foreseeable to Fox. But it did not consider that question in the context of a connection with the joint criminal activity between Fox and Sykes. *See, e.g., United States v. Artley*, 489 F.3d 813, 822-23 (7th Cir. 2007). The court stated that "[Fox] was aware that Sykes stored drugs at his residence." Without consideration of whether that awareness arose out of Fox's joint criminal activity with Sykes, however, this finding is insufficient, because reasonable foreseeability requires more than just subjective awareness. *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir. 1991).

In Fox's case, the district court's inclusion of the 40 grams of crack cocaine in his drug quantity calculation instead of only the 4.138 grams involved in the June 13, 2007 transaction resulted in a guidelines range of imprisonment of 46-57 months instead of 24-30 months, which is a substantial increase. Although a district court's findings of relevant conduct are reviewed only for clear error, even such deference cannot cure an absence of findings on key elements of the analysis.

*United States v. Schaefer*, 291 F.3d 932, 939 (7th Cir. 2002). For these reasons, we will vacate and remand Fox's sentence for reconsideration of his relevant conduct under Section 1B1.3 and applicable drug quantity under Section 2D1.1.

### C.  Reasonableness of Sentences

Sykes and Fox also contend that their sentences were both procedurally unreasonable (because the district court erred in applying the Sentencing Guidelines) and substantively unreasonable (because they do not reflect the 18 U.S.C. § 3553(a) factors). These arguments relating to application of the guidelines have already been addressed, and the arguments relating to substantive reasonableness are not persuasive because the district court carefully examined each of their situations and did not abuse its discretion in selecting their sentences.

### D.  *Kimbrough* Remands

The district court sentenced Sykes and Fox on November 21, 2007 using the 100-to-one powder to crack cocaine ratio. On December 10, 2007, the Supreme Court decided *Kimbrough v. United States*, 128 S. Ct. 558, 564, 169 L. Ed. 2d 481 (2007), in which it held that this ratio is not dictated by statute, but is merely advisory. In *United States v. Taylor*, 520 F.3d 746, 747-48 (7th Cir. 2008), we held that a limited remand is appropriate in cases where the defendant did not object to the ratio in the district court. Additionally, in *United States v. Clanton*,

538 F.3d 652, 660 (7th Cir. 2008), we held that a defendant who was characterized as a career offender but whose offense level calculated under § 2D1.1 was higher than that calculated under § 4B1.1(b), was effectively sentenced under the guideline's crack-to-powder ratio and was also entitled to a *Kimbrough* remand.

Sykes did not waive the crack penalty argument because he did not expressly decline to raise it, and there is no forfeiture because it was not clear until *Clanton* that he was entitled to a *Kimbrough* remand. Therefore, his case will be remanded for resentencing in light of *Kimbrough*.

### III. Conclusion

For the foregoing reasons, we VACATE the sentences and REMAND Sykes's case for resentencing in light of *Kimbrough* and Fox's case for resentencing consistent with this opinion.