NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 27, 2009
Decided November 19, 2009

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

Nos. 08-1437 & 08-1503

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeals from the United States District |
| *Plaintiff-Appellee,* | Court for the Central District of Illinois. |
| *v.* | No. 07 CR 20002 |
| GERARDO LUGO and | Michael P. McCuskey, |
| JOSE C. RIOS, | *Chief Judge.* |
| *Defendants-Appellants.* | |

**O R D E R**

One day before we heard oral arguments in this case, we released an opinion that began with this line:

> This appeal, like many others we see, involves a squabble over
> what constitutes properly considered "relevant conduct" under
> the federal sentencing guidelines.

*See United States v. Rosenberg*, ___ F.3d ___ , 2009 WL 3416108 (October 26, 2009). Ditto for this case.

Jose Rios and Gerardo Lugo were convicted of conspiracy to distribute five or more kilograms of cocaine. Lugo was also convicted on two substantive cocaine distribution

charges; Rios was acquitted on a gun charge. Rios was subsequently sentenced to a term of 324 months. Lugo drew a 162-month sentence. Both appeal.

Neither Rios nor Lugo raise issues growing out of their nine-day jury trial in the district court. Their appeals are confined to sentencing. Lugo argues that too much cocaine was put in his "relevant conduct" basket; Rios says he was sentenced on the basis of "inaccurate information." We start with the facts, both from the trial and, because of the nature of the issues raised on the appeal, from the presentence report which the district court found to be credible.

Rios and Lugo are brothers-in-law. For several years ending in mid-2006, Rios headed a cocaine trafficking operation based in the Kankakee (Illinois) area with a satellite operation in Iowa. Rios arranged for multiple kilograms of cocaine to be transported weekly from Chicago to Kankakee. Once it arrived he fronted the drugs to a network of distributors who, in turn, distributed it to others. Rios's transactions with his distributors-- where he supplied them with cocaine and collected their money--usually took place at his trailer or at a storage facility known as "Big House Customs."

During the conspiracy, Rios supplied his distributors with multi-ounce quantities of cocaine (ranging from 2 to 9 ounces) on a weekly basis. One of the distributors, Robert Odeneal, purchased up to 9 ounces of cocaine from Rios every week from mid-2004 to May 2005; another, Anthony Allegro, purchased up to 4 ounces from Rios at least once a week in 2003 and 2004.

In 2005, sensing heat from law enforcement, Rios moved to Chicago and put Lugo in charge of the day-to-day operations in Kankakee. Rios instructed his distributors to contact Lugo to purchase their cocaine, although the distributors could still contact Rios if they were unable to make arrangements with Lugo. Lugo paid the rent on Rios's trailer and continued to use it to conduct drug transactions. From April 2005 until his arrest in August 2006, Lugo sold cocaine to five distributors--Odeneal, Allegro, Christopher Morrisette, Brent Goselin, and Jeffrey Brownsey. He admits that he is responsible for just a bit over 14 kilos. However, he objects to anything more that would push him over 15 kilos.

We pause for a moment before going further so Lugo's argument on appeal can be put in perspective. Because he concedes responsibility for 14 kilos of cocaine, just one more kilo moves him up a notch under the federal sentencing guidelines. Responsibility for at least 5, but less than 15 kilos of cocaine (with all other adjustments and criminal history remaining the same), results in a guideline range of 121 to 151 months. Pushing the amount of cocaine over 15 kilos moves the guideline range to 151-188 months. So the same within-range sentence of 151 could be imposed, oddly enough, if the cocaine attached to a

defendant is either 5.1 kilos or 49.9 kilos--the top end of the "at least 15 but not more than 50 kilos" range. Lugo, as we mentioned, drew a term of 162 months, 11 months more than the top of the 5-15 range but 26 months less than the top of the 15-50 range. And of course the district judge, working now in our advisory guidelines system, could very well have imposed the same 162-month sentence even without putting the extra kilo of cocaine in Lugo's relevant conduct if he thought it was called for after applying the sentencing factors in 18 U.S.C. § 3553(a).

Now back to Mr. Lugo and the issue of the additional cocaine. In 2002, Josh Lambert (we'll call him "Josh" because his brother Ryan is also a player) was purchasing cocaine from Rios. During the summer of that year, Allegro met Josh and began purchasing cocaine from him. Josh later introduced Allegro to Rios. Allegro eventually began purchasing his cocaine directly from Rios at Rios's trailer. Before Rios moved to Chicago, Rios introduced Allegro to Lugo at the trailer. Rios told Allegro that Lugo "was taking over." Thereafter, Allegro continued to purchase up to 4 ounces of cocaine per week from Lugo at various locations, including the trailer. Those amounts were included in the 14-plus kilograms of cocaine for which Lugo concedes responsibility.

Josh continued to purchase cocaine from Rios even after Allegro was no longer his buyer. By 2004, Josh moved to Chicago and, with his brother Ryan, started distributing cocaine in Iowa. Ryan lived in Dubuque and sold the cocaine Josh obtained from Rios. In approximately January 2005, the Lambert brothers got their cousin, James Pline, to assist them in their distribution efforts. At least 20 times between January 2005 and August 2005, Pline, who also lived in Dubuque, picked up cash from Ryan in Iowa and drove to Illinois to meet Josh. On these occasions, Pline gave the cash to Josh, who then provided Pline with at least one pound of cocaine to return to Ryan in Iowa.

Pline would generally meet Josh to make an exchange somewhere along Interstate 80 in Illinois. On two occasions, Pline picked up the cocaine in Kankakee from Rios. On the first occasion, Josh told Pline to go to Big House Customs where someone would meet him. When Pline arrived at that location, Rios was there to meet him. Pline gave Rios the cash he was transporting, and Rios put a box full of cocaine in the trunk of Pline's car.

On the second occasion, in August 2005, Pline met Josh in Kankakee and followed him to Rios's trailer. Pline and Josh met with Rios at the trailer. Pline gave Rios the cash he brought from Iowa, and Rios gave Pline a box containing 504 grams of cocaine to take to Iowa. On the trip back to Iowa, police officers stopped Pline's car and seized the cocaine Rios had given Pline.

Pline never met Lugo or had any direct dealings with him. But the district court found that 4.5 kilos of cocaine Rios supplied to Josh and Pline for distribution in Iowa were includable as part of Lugo's relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). We can disturb this finding only if it was clearly erroneous. *United States v. Hollins*, 498 F.3d 622, 629 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1324 (2008).

As we have said countless times, a defendant in a drug conspiracy "is liable for all quantities of drugs with which he was involved directly and any amounts attributable to his co-conspirators if those amounts were reasonably foreseeable to him." *Hollins*, 498 F.3d at 629.

To determine a defendant's responsibility for drugs based on the conduct of others, a sentencing court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." U.S.S.G. § 1B1.3, comment. (n.2). If the court determines that the conduct of others was "both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant," the court may hold the defendant responsible for that conduct. *Id.*

Lugo is responsible for not only the drugs with which he was directly involved, but also for "foreseeable quantities . . . that were within the scope of the criminal activity that he jointly undertook." *Id.*

There is no evidence that Lugo had direct dealings with either Pline or Josh. Therefore, in order to hold Lugo accountable for the cocaine Rios distributed to either of them, the government had to prove that the distributions were within the scope of the agreement between Rios and Lugo and were reasonably foreseeable to Lugo. We think the district court's finding that the government met this burden is not clearly erroneous.

The scope of the cocaine distribution agreement between Rios and Lugo was very broad. When Rios relocated to Chicago, he placed Lugo in charge of the day-to-day operations of the organization. Rios told his distributors to contact Lugo to obtain their cocaine, and he empowered Lugo to collect drug payments and outstanding debts. Although Rios moved to Chicago, the drug operation remained centered in Kankakee, particularly at Rios's trailer and at Big House Customs. As we have noted, Lugo continued to use Rios's trailer to facilitate drug transactions, and he paid the rent for the trailer. Further, although Rios moved to Chicago, he didn't cease his involvement in the distribution of the cocaine. While Rios turned the day-to-day operation over to Lugo, Lugo was aware that Rios maintained contact with distributors and supplied them with cocaine if they were unable to reach Lugo. In short, Lugo occupied a central role in the conspiracy for

some 18 months, and during that time he knew that Rios continued to be an active member of the cocaine distribution enterprise. These facts show that Lugo's agreement with Rios was not limited to supplying only a few dealers in the Kankakee area. Rather, Lugo agreed to assist Rios in the distribution of cocaine as a trusted coconspirator. This broader view of the scope of the joint activity, coupled with Lugo's knowledge of Rios's continuing involvement in the actual supplying of cocaine to distributors, supported the district court's conclusion on relevant conduct.

Lugo emphasizes that he did not know nor have any direct dealings with Pline. A good point of argument, but it is not dispositive. Relevant conduct determinations do not require a defendant to personally handle drugs in order to be accountable for them. *See United States v. Nubuor*, 274 F.3d 435, 443 (7th Cir. 2001). A defendant does not have to be "involved in or even have direct knowledge of a particular transaction" in order to be held accountable for drug quantities. *Hollins*, 498 F.3d at 630 (citing *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993)). As 5.08 of the Seventh Circuit Jury Instructions makes clear, to be accountable as a member of a conspiracy, a defendant need not "know all the other members or the means by which its purpose was to be accomplished."

Lugo relies on two cases to support his argument--*United States v. Fox*, 548 F.3d 523 (7th Cir. 2008), and *United States v. McDuffy*, 90 F.3d 233 (7th Cir. 1996). Both are distinguishable.

In *Fox*, the defendant, at the behest of his coconspirator, made a single sale of crack to an undercover police officer. 548 F.3d at 525. Two weeks after the sale, the police searched the coconspirator's house and found an additional 40 grams of crack. *Id.* At sentencing, the district court held the defendant responsible for both the crack he distributed to the officer and the crack found at the coconspirator's house. *Id.* at 528. We vacated the sentence, noting that the only conduct in the record involving any joint criminal activity between the defendant (who was a crack addict) and his coconspirator was the defendant's single sale of crack and his spending time at the coconspirator's house to get high.

Unlike the situation in *Fox*, the relationship between Rios and Lugo was far from limited to a single sale of cocaine. Their joint activity was expansive and involved sales to many individuals over a long period. The single-sale scenario in *Fox* is considerably different from the repetitive sales of cocaine made by Rios and Lugo. *McDuffy*, the other case on which Lugo relies, also involved an isolated sale.

As we see it, the evidence clearly suggests that Lugo was a manager of his brother-

in-law's cocaine operation and that Rios's dealings with both Josh and Pline were clearly foreseeable objects of their conspiracy. The disputed amounts of cocaine were properly put into Lugo's relevant conduct basket.

Resolving Rios's appeal doesn't require much ink. His guideline range, not challenged on appeal, was 324-405 months. The government asked for 360. The judge decided on 324. Because the range was accurately determined and the sentence was not only within, but also at the bottom of the range, it is presumed to be reasonable. We thus review it only for an abuse of discretion.

Rios's appeal rests on his claim that his sentence is based on misinformation. The "district court repeatedly referred to this as a case involving crack cocaine," says Rios. Plus, the district court "characterized" him as a "career offender."

For one thing, the district court presided over a nine-day jury trial. It knew the case involved powder, not crack, cocaine. The court's references at sentencing to crack cocaine cases were made in the context of explaining how serious Rios's conduct was. This case, the judge explained, was much more serious than a run-of-the-mill crack case. True, the judge did say at one point that this case involved "a highly sophisticated *crack* cocaine business," but in context that was no more than a slip of the tongue. That is especially so when we note that at another point, the judge said Rios's case involved "big-time powder."

Rios also claims the district court mistakenly characterized him as a career offender. However, the court did not sentence Rios as if he were classified as a career offender. Instead, responding to Rios's counsel's argument that the government's sentencing recommendation was akin to one appropriate for a career offender, which Rios was not, the district court remarked that Rios had been acting like a career offender for several years. The court's comment did not suggest that Rios was a "career offender" for guidelines purposes, and the court did not sentence Rios as if he were classified as a career offender.

Finally, we find no abuse of discretion in the court's decision to keep him in criminal history category II against a claim that it overrepresented his record.

For these reasons, the sentences imposed by the district court in this case are AFFIRMED.