In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-2378, 08-3226 & 08-3238

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AIDA SALEM, BOGDAN GANESCU,
and GIANINA SIMON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 923—**John W. Darrah**, *Judge.*

ARGUED NOVEMBER 3, 2009—DECIDED MARCH 9, 2010

Before EASTERBROOK, *Chief Judge,* and WOOD and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* In these appeals we consider
the application of the relevant conduct guideline,
U.S.S.G. § 1B1.3(a)(1)(B), in a case of a jointly undertaken
criminal activity. Aida Salem pled guilty to one count of
wire fraud and was sentenced to 97 months' imprison-
ment. Bogdan Ganescu and Gianina Simon pled guilty

to several counts of wire fraud and two counts of receipt of stolen funds. They were sentenced to 78 months and 52 months, respectively. The defendants appeal their sentences, challenging the district court's relevant conduct findings. For the reasons that follow, we remand the sentences for further findings concerning the jointly undertaken criminal activity under U.S.S.G. § 1B1.3(a)(1)(B) and, if necessary, for further findings regarding the amount of the loss and the number of victims under U.S.S.G. § 2B1.1(b)(1) and (2).

## I. Background

A superseding indictment charged that Aida Salem, Bogdan Ganescu, Gianina Simon, eleven codefendants, and others in the United States and abroad knowingly devised and participated in a scheme to defraud. Beginning in approximately November 2003 through at least August 2006, more than 2000 victims of the scheme were tricked into believing that they were purchasing items listed for sale on Internet sites and wired funds to the defendants and other co-schemers in amounts in excess of $6 million. The victims never received the items.

As part of the scheme, individuals located outside the United States, principally in Romania (the "foreign co-schemers"), posed as sellers of items and lured victims through fraudulent advertisements on Internet sites, typically eBay. When a victim agreed to purchase an item, he or she was instructed to send payment by wire transfer, typically through Western Union. The foreign co-schemers believed that victims in the United

States would be more likely to transmit their money if the foreign co-schemers posed as sellers in the United States. Therefore, the foreign co-schemers developed a network of individuals in the United States, including all fourteen defendants and other co-schemers, who were willing to repeatedly pick up the funds/fraud proceeds from a Western Union agent. After retaining a portion (typically 20% to 40%) of the fraud proceeds received, the defendants and other co-schemers transmitted the balance of the proceeds to Romania.

In order to reduce the risk of apprehension by law enforcement, the co-schemers obtained and used false identification documents when picking up the fraud proceeds from a Western Union agent. This required ongoing communication between the persons who managed the receipt of fraud proceeds in the United States—schemers such as Adrian Fechete, Raimondoray Cerna, and Gabriel Constantin—and the foreign co-schemers. The co-schemers communicated their changing aliases to the foreign co-schemers, and the foreign co-schemers incorporated the alias names into their Internet communications with potential victims, usually as the "seller," "seller's agent," or "eBay agent" of the item offered for sale. Once someone agreed to purchase an item, he or she was instructed to send the funds via Western Union to the alias name provided by a defendant to the foreign co-schemers. The victim provided funds via Western Union in payment for the item. The foreign co-schemers gave the appropriate co-schemer the information necessary to complete the wire transfer that had been provided by the victim. Then

the co-schemer presented himself or herself, using the matching alias identification documents at a Western Union, representing himself or herself as the authorized payee for the wire transfer of funds and received the funds.

*Aida Salem*

Salem pled guilty pursuant to a written plea agreement to one count of wire fraud, 18 U.S.C. § 1343. The agreement described the fraud scheme and stated that Salem learned about the scheme from codefendant Raimondoray Cerna in approximately November 2003 and participated in the scheme from then until approximately January 2006. Salem admitted that as part of the scheme, he and his co-schemers took and received money from the victims with no intent of ever giving them the items they believed they were purchasing. He admitted that he used alias identification documents to present himself to Western Union agents and provided them with the information relayed from the foreign co-schemers that enabled him to receive the victims' funds.

Salem's plea agreement stated that "[w]hile participating in the scheme, [Salem] shared a common source of false identification documents with a number of his codefendants." The agreement provided one example from late March through late April 2004 involving Salem and codefendants Cerna, Gabriel Constantin, Adrian Ianc, Muszka Ladislau, and Radu Rizescu. Then it gave another example for various occasions in 2005 involving Salem, Ianc, Ladislau, Simon, and Ganescu. The agree-

ment stated that Salem also shared with his co-schemers "information on currency exchanges . . . such as which to avoid and which were favorable," "used common currency exchanges . . . to receive fraud proceeds, and shared rides to currency exchanges when receiving victims' wire transfers." It gave several examples involving Salem and Fechete, Mihai Panaitescu, Constantin, and Ianc. It also stated that Salem and Cerna were arrested together when officers discovered they were in possession of counterfeit identification. The agreement added that for several months Salem and Ianc resided in the same apartment complex and that they also "shared a common source of Western Union transaction information" and "occasionally traveled together . . . when receiving fraud proceeds from Western Union agents."

Furthermore, Salem admitted in his plea agreement that on some occasions, he and other co-schemers provided "common false addresses and phone number[s] when completing the Western Union . . . form[s]." The agreement provided several examples involving Salem, Ianc, Constantin, Cerna, Marian Alexandru, Fechete, and Ioan Moloman. Cell phone records revealed that during the time period that Salem participated in the scheme, he was in frequent contact with co-schemers, including Panaitescu, Fechete, Constantin, Moloman, Ianc, and Cerna. Salem admitted that at Cerna's direction, he and other co-schemers, including Panaitescu, Moloman, Stefan Dumitru, Lucian Nanau, Alexandru, and Mihail Hann, transmitted funds owed to the foreign co-schemers. Salem further admitted that he personally

received wire transfers of funds from victims of the scheme in an amount in excess of $400,000. The Presentence Investigation Report ("PSR") indicated that during the time of Salem's participation in the scheme, approximately 2100 victims lost more than $5.3 million. Salem also admitted in his plea agreement that he was aware that his codefendants such as Fechete, Ianc, Constantin, Mihai Bledea, Moloman, Hann, Alexandru, Panaitescu, Constantin Lucan, Dumitru, and Nanau were also receiving wire transfers from the scheme to defraud.

Based on this, the government's position before sentencing was that Salem was responsible for between $2.5 million and $7 million in losses and over 250 victims—numbers that would result in Guidelines enhancements under U.S.S.G. § 2B1.1(b). Salem, however, contended the loss was more than $200,000 but not more than $400,000, and that the offense involved more than 50 but less than 250 victims. In his Objections to PSR and Sentencing Memorandum, Salem acknowledged that "he undertook and participated in criminal activity with and as directed by co-defendant managers Cerna and Ianc" and argued that the government failed to prove that he "should be held responsible for the losses caused by the other participants beyond Cerna and Ianc." And at the sentencing hearing, Salem's counsel stated that Salem was accepting responsibility not only for his own actions but also for "the reasonably foreseeable actions of co-participants in the scheme, specifically individuals such as Mr. Cerna, Mr. [Ianc], the gentlem[e]n who recruited my client, and also managed

and supervised him."[1] At the sentencing hearing on May 22, 2008, the government conceded a total loss of greater than $1 million but less than $2.5 million.

The district court found by a preponderance of the evidence that:

> Cerna, Fechete, Ianc, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau participated in the scheme,[2] and it was reasonably foreseeable to [Salem] then that because of the known conduct or reasonably foreseeable conduct of these other persons to [him], that over a thousand victims would suffer losses of $1 million but less than $2.5 million.

The court found that under U.S.S.G. § 2B1.1(a)(1) Salem's base offense level was seven and added sixteen levels based on the amount of the loss, U.S.S.G. § 2B1.1(b)(1)(I), and added six levels based on the number of victims, U.S.S.G. § 2B1.1(b)(2)(c). The resulting Guidelines range

---

[1] The transcript reads "Young," but we believe it should be "Ianc," based on the context, Salem's sentencing memorandum, and subsequent comments by Salem's counsel at the hearing. In addition, we note that Salem acknowledged that he was recruited, managed, and supervised by both Cerna and Ianc.

[2] The district court did not mention Bledea's name at this point, but it had just mentioned him as one of the codefendants of whom Salem was aware was receiving wire transfers in the scheme. With the laundry list of names of co-schemers, this oversight is understandable.

was 97 to 121 months. The court sentenced Salem to 97 months, at the bottom of the range, and ordered him to pay $404,091 in restitution.

*Bogdan Ganescu and Gianina Simon*

On September 4, 2007, Ganescu and Simon pled guilty, without plea agreements, to several wire fraud counts, 18 U.S.C. § 1343, and two counts of receipt of stolen funds, 18 U.S.C. § 2315. In their plea declarations, Ganescu and Simon admitted to participating in a scheme to defraud users of Internet auction sites such as eBay, and to obtaining money by means of materially false and fraudulent pretenses. They admitted that not later than August 2004, they learned about the scheme and how it worked from codefendant Gabriel Constantin. They also admitted that in order to participate in the scheme, they obtained and used a series of alias identification documents that falsely identified them as the persons to whom the victims should send their money and that they ultimately received the victims' funds from Western Union agents.

The Government's Version of the Offense ("Government's Version"), which was attached to the defendants' PSRs, indicated that photographs obtained during the investigation of the scheme demonstrated Ganescu's and Simon's close association with several codefendants, including Constantin, Ianc, Bledea, and Rizescu. The photos included pictures of Ganescu and Simon at Rizescu's staged wedding, which was part of a fraudulent application for permanent United States residency. Also

according to the Government's Version, phone records showed frequent call activity between Ganescu's and Simon's cell phones and those of Constantin, Ianc, and Bledea. The Government's Version stated that Simon used the same attorney that Ianc and Bledea used following their arrests on charges arising out of the scheme to defraud. On appeal, Ganescu and Simon do not dispute the accuracy of these factual assertions, but argue about what inferences may reasonably be drawn from them.

Ganescu admitted in his plea declaration that between approximately October 2004 and June 2005, he received wire transfers of fraud proceeds of approximately $174,000 from at least 90 victims of the scheme. (The government later learned that his participation continued into December 2006 and that he received fraud proceeds from approximately 129 victims.) Simon admitted in her plea declaration that between approximately September 2004 and August 2005, she received wire transfers of fraud proceeds of approximately $63,000 from at least 29 victims. Ganescu and Simon also admitted that they retained a portion of the fraud proceeds for themselves and caused the remainder—more than $126,000—to be transmitted to the foreign co-schemers in Romania. Each admitted an awareness that the other was participating in the scheme and receiving fraud proceeds from additional victims. They also admitted to sharing common sources of false identification documents between themselves and with several codefendants: Ianc, Salem, and an individual identified as "SB." Ganescu admitted to sharing common sources with Bledea and Ladislau as well.

According to the Government's Version, during the time that Ganescu and Simon participated in the scheme, more than 2000 victims suffered losses in excess of $5.4 million. The government asserted that Ganescu received wire transfers of fraud proceeds in amounts totaling about $239,000 and that together Ganescu and Simon received about $313,000 from approximately 163 victims.

The principal issue at Ganescu and Simon's sentencing hearing was whether the conduct of other codefendants was reasonably foreseeable to Ganescu and Simon for purposes of the loss amount and number of victims for which they should be held accountable as relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). The government argued that much of the conduct of others involved in the scheme was foreseeable to Ganescu and Simon based on their close relationship with significant participants in the scheme such as Ianc and Constantin. The government asserted that a conservative estimate of the loss foreseeable to Ganescu and Simon would be the losses caused during the time they participated in the scheme and traceable to Ganescu, Simon, and the co-schemers with whom they were most closely associated, namely Constantin, Bledea, Ianc, "Individual EM," and Cristian Bentan. According to the government's spreadsheet detailing Western Union transactions, the transactions received directly by these co-schemers totaled $1,176,967.81 and represented losses to approximately 500 victims of the scheme.

The district court identified the crux of the matter as whether the actions of co-schemers Ianc, Constantin,

Bledea, and EM were reasonably foreseeable to Simon and Ganescu. The court found by a preponderance of the evidence that the conduct of Ianc, Constantin, Bledea, and EM was reasonably foreseeable to Ganescu. It found that the conduct of Ganescu, Ianc, Constantin, Bledea and EM was reasonably foreseeable to Simon. These findings led the court to find a loss amount of $1,176,967.81 and a total number of victims in excess of 250, with a corresponding sixteen-level increase to Ganescu's and Simon's base offense level under U.S.S.G. § 2B1.1(b)(1)(I) and a six-level increase under § 2B1.1(b)(2)(C).[3]

Ganescu and Simon had an identical Guidelines range of 78 to 97 months. The district court sentenced Ganescu to a within-Guidelines sentence of 78 months and ordered him to pay $229,000 in restitution. After considering the § 3553(a) factors, including Simon's overall culpability, and finding that she had been deterred and recidivism was not a factor in her case, the court sentenced Simon to a below-Guidelines sentence of 52 months. The court also ordered her to pay $62,000 in restitution.

---

[3] The loss amount and number of victims was taken from Government's Exhibit 018. The exhibit attributes approximately $9800 of the total loss and four victims to the conduct of codefendant Cristian Bentan. The district court did not find that Bentan's conduct was reasonably foreseeable to either Ganescu or Simon. If the loss amount were adjusted accordingly, a $9800 reduction in the loss and subtraction of four victims would not affect the increase in offense levels under § 2B1.1(b)(1)(I) (loss more than $1,000,000 but no more than $2,500,000) and § 2B1.1(b)(2)(C) (more than 250 victims).

## II. Discussion

The defendants contend that the district court erred in its relevant conduct findings. They argue that under *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir.), *cert. denied*, 129 S. Ct. 261 (2008), the evidence must show that a defendant assisted or agreed to promote a coconspirator's conduct for such conduct to be within the scope of jointly undertaken activity under U.S.S.G. § 1B1.3(a)(1)(B). They claim that the evidence failed to show that they assisted or agreed to promote conduct of their co-schemers and that the enhancements based on the amount of loss and number of victims were therefore unwarranted. Salem also argues that the acts of his co-schemers were not acts in which he joined or which he furthered. Finally, the defendants argue that the district court erred because it neglected to make a finding of jointly undertaken criminal activity before addressing whether their codefendants' conduct was foreseeable to them.

Ganescu and Simon acknowledge that when a party fails to raise an issue in the trial court, we generally review for plain error. *See United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008). However, the government asserts that in this case we review the district court's determinations of the amount of the loss and number of victims for which the defendants should be held accountable for clear error. It therefore has waived its right to rely on plain error review. *See United States v. Murphy*, 406 F.3d 857, 860 (7th Cir. 2005) (concluding that the government "waived waiver" by asserting the plain

error standard applied); *United States v. Cotnam*, 88 F.3d 487, 498 n.12 (7th Cir. 1996) (noting that since defense counsel failed to object at trial, the court would normally review for plain error, but because the government did not argue for the plain error standard, it waived the right to invoke that standard). Hence, we review the district court's relevant conduct determinations for clear error. *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008). Under this standard, we will uphold the district court's findings "unless, after considering all of the evidence, we are left with a definite and firm conviction" that a mistake has been made. *Id.* (quotation omitted). We review the district court's application of the Guidelines de novo. *Garrett*, 528 F.3d at 527.

As part of its determination of a defendant's offense level under the Guidelines, a court determines the base offense level and applies appropriate specific offense characteristics. U.S.S.G. § 1B1.1(b). Specific offense characteristics depend not only on the offense of conviction but also on relevant conduct. *United States v. Alldredge*, 551 F.3d 645, 646 (7th Cir. 2008); U.S.S.G. § 1B1.3(a). In the case of a jointly undertaken criminal activity, relevant conduct is determined on the basis of "'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *Soto-Piedra*, 525 F.3d at 531 (quoting U.S.S.G. § 1B1.3(a)(1)(B)). A criminal scheme "'undertaken by the defendant in concert with others'" is included within the definition of a "jointly undertaken criminal activity." *Id.* (quoting U.S.S.G. 1B1.3(a)(1)(B)). Thus, a defendant may be held

accountable for the conduct of others "if that conduct was in furtherance of a jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity." *United States v. Fouse*, 578 F.3d 643, 653 (7th Cir. 2009).

In addressing a jointly undertaken criminal activity in *Soto-Piedra*, we said that the "[a]ctions of coconspirators that a particular defendant does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity." 525 F.3d at 533 (citing U.S.S.G. § 1B1.3 cmt. n.2). The defendants seize upon this language, arguing that it heightened the standard for determining the scope of a jointly undertaken criminal activity. We do not read *Soto-Piedra* in this way.

Instead, the "assist or agree to promote" language is simply another way of stating the requirement that the conduct of others for which a defendant is accountable must be in furtherance of the joint criminal activity that the defendant in question undertook. This is another way of saying that the mere foreseeability of another's conduct is not sufficient to bring that conduct within the scope of a defendant's jointly undertaken criminal activity. In *Soto-Piedra*, the defendant objected to the conclusion that he was responsible for 14 to 15 kilograms of crack, which affected his base offense level. The defendant had not sold crack to anyone, so we said that in order to determine his base offense level based on a substantial amount of crack, the government had to prove he had reached an agreement to sell powder cocaine intending that it be converted into crack. *Id.* at

531. We said that the defendant agreed to supply his coconspirator with an unknown grade of powder cocaine, to be provided to an unknown customer with an unknown intention. We used the "assist or agree to promote" language in concluding that the government offered no evidence to suggest "that converting the powder cocaine to crack was within the scope of [the defendant's] contemplated undertaking." *Id.* at 533.

The authorities *Soto-Piedra* cited for the "assist or agree to promote" language bolster the conclusion that the case did not impose a heightened standard. *See United States v. Bustamante*, 493 F.3d 879, 887-88 (7th Cir. 2007) (noting § 1B1.3's requirement that relevant conduct be "in furtherance of the jointly undertaken criminal activity" and concluding that the evidence was insufficient to prove that the defendant furthered the conspiracy alleged in the indictment); *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997) (indicating that reasonable foreseeability is not enough to establish liability for coconspirators' acts under § 1B1.3; such acts must also be in furtherance of jointly undertaken criminal activity); *United States v. Studley*, 47 F.3d 569, 576 (2d Cir. 1995) (remanding where the record supported the conclusion that the defendant's agreement to participate in the fraudulent scheme was limited to his own fraudulent activity and he did nothing to further the overall scheme); U.S.S.G. § 1B1.3 cmt. n.2 (illustration (c)(1)). And this court has not understood *Soto-Piedra* as altering the standard for the scope of jointly undertaken criminal activity. *See United States v. Dean*, 574 F.3d 836, 844-45 (7th Cir. 2009) (quoting the "assist or agree to

promote" language when stating the proposition that "a defendant may be held liable only for those acts or omissions that were both made in furtherance of the conspiracy and foreseeable to the defendant"). Therefore, *Soto-Piedra* did not impose a heightened standard for determining the scope of a jointly undertaken criminal activity. So we consider the sufficiency of the district court's findings in this case.

In applying U.S.S.G. § 1B1.3(a)(1)(B), the district court must make a preliminary determination of the scope of the criminal activity the defendant agreed to jointly undertake. *United States v. Fox*, 548 F.3d 523, 531-32 (7th Cir. 2008); *United States v. Thomas*, 199 F.3d 950, 953 (7th Cir. 1999); U.S.S.G. § 1B1.3 cmt. n.2 ("In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)."). Then the court must make a two-part determination of whether the conduct of others was *both* in furtherance of that joint criminal activity *and* reasonably foreseeable to the defendant in connection with the joint criminal activity. *Fox*, 548 F.3d at 532; *Thomas*, 199 F.3d at 953; U.S.S.G. § 1B1.3(a)(1)(B). "[A]n absence of findings on key elements of the [relevant conduct] analysis" cannot be cured by a deferential clear error standard of review. *Fox*, 548 F.3d at 532; *see also Dean*, 574 F.3d at 846 (vacating and remanding sentence for a specific finding as to the reasonable foreseeability to the defendant of the quantity of drugs).

In *Fox*, for example, two codefendants were convicted of a crack cocaine conspiracy. One challenged the drug quantity that the district court found as part of his relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). He argued that the court erred in focusing exclusively on the foreseeability requirement of relevant conduct, ignoring its other requirements. We agreed, finding several problems with the relevant conduct analysis. *Fox*, 548 F.3d at 531. First, the district court did not determine the scope of the defendant's jointly undertaken criminal activity. *Id.* at 531-32. Second, although the district court considered whether the codefendant's possession of crack cocaine was foreseeable to the defendant, it did not consider whether that possession was foreseeable in connection with the joint criminal activity. *Id.* We therefore concluded that the district court's relevant conduct findings were insufficient and vacated and remanded for resentencing. *Id.* at 533.

Here, the district court made findings as to the reasonable foreseeability of the co-schemers' acts only; it made no finding as to the scope of the jointly undertaken criminal activity. The government argues that, given the record and circumstances of this case, the lack of an express finding by the district court does not warrant setting aside the finding that Salem, Ganescu, and Simon are accountable for the conduct of certain of their co-schemers that occurred during the time period in which Salem, Ganescu, and Simon participated in the scheme. The government asserts that it is clear from the record that the district court considered the Government's Version and the defendants' PSRs, which contained great

detail about the nature of the criminal activity that Salem, Ganescu, and Simon agreed to jointly undertake.

This case is quite different from the cases cited by the government to support its argument. *See United States v. Wilson*, 502 F.3d 718, 722-23 (7th Cir. 2007); *United States v. Acosta*, 85 F.3d 275, 279-80 (7th Cir. 1996). In *Acosta*, the defendant, who had been convicted of possession of heroin with the intent to distribute, challenged the district court's determination that a series of cocaine sales he had made to another individual were relevant conduct. 85 F.3d at 277, 279. The district court did not find that those cocaine sales were relevant conduct; however, before sentencing the defendant, the court expressly adopted the factual findings in the PSR. Facts recited in the PSR provided the necessary connection between the cocaine sales and the defendant's offense of conviction to treat the sales as relevant conduct under § 1B1.3(a)(2). *Id.* at 279-80. We stated that the court should "explicitly state and support" its finding that uncharged conduct had the necessary relationship to the offense of conviction to support a relevant conduct finding. *Id.* at 280 (quotation omitted). However, we added:

> [W]here it is clear from the record that the district court considered and adopted the facts recited in the presentence report, as well as the government's reasoning concerning the significance of those facts in establishing the defendant's responsibility for uncharged conduct, we have upheld the court's decision to treat the uncharged activities as relevant conduct despite the lack of an express finding . . . .

*Id.* (citations omitted). Because it was clear that the court considered the cocaine sales to be relevant conduct, we upheld its implicit relevant conduct determination despite the absence of an express finding that the sales were part of the same course of conduct as the heroin offense. *Id.*

Similarly, in *Wilson* the district court failed to make an explicit finding that other drug transactions in which the defendant had participated were part of the same course of conduct or common scheme as the offense of conviction. Yet we understood from the court's specific findings at sentencing that it clearly believed that the defendant's drug trafficking was a common scheme and part of the same course of conduct as his offense of conviction. *Wilson*, 502 F.3d at 723. We therefore held that the court did not clearly err in finding that the defendant's prior drug transactions constituted relevant conduct. *Id.* at 724.[4]

Here, the district court did not adopt the findings in the PSRs at the sentencings. Thus, the judge's oral explanation of the reasons for the sentences imposed falls short of the requirement that "[t]he court, at the time of

---

[4] *Acosta* and *Wilson* are also distinguishable because the courts in those cases considered whether the defendant's own conduct was relevant conduct under U.S.S.G. § 1B1.3(a)(2). Here, the district court considered whether the defendants should be held accountable not only for their own acts but also for the acts of others under § 1B1.3(a)(1)(B). Different standards apply to these subsections of the Guideline.

sentencing, shall state in open court the reasons for its imposition of the particular sentence . . . ." 18 U.S.C. § 3553(c); *see also United States v. Harris*, 567 F.3d 846, 854-55 (7th Cir.) (suggesting court's explanation was insufficient where court merely said it considered the information in the presentence report, including the Guideline computations and the sentencing factors, but failed to state the reasons for its sentence), *cert. denied*, 130 S. Ct. 1032 (2009); *United States v. Molina*, 356 F.3d 269, 277 (2d Cir. 2004) (holding that district court did not satisfy § 3553(c)'s "open court" requirement with a statement of reasons in a later written judgment where the court made no specific factual findings and did not expressly adopt the PSR at the sentencing hearing).

The district court did adopt the factual findings in the defendants' PSRs in its "Statement of Reasons" attachment to the Judgment in a Criminal Case, AO Form 245B, see http://www.uscourts.gov/forms/uscforms.cfm?StartRow=61 (last visited Feb. 19, 2010), but this was inadequate for several reasons. In some circumstances, the adoption of a PSR's findings could constitute sufficient factual findings. For example, the adoption of such findings at a sentencing hearing can be sufficient. *See, e.g.*, *Acosta*, 85 F.3d at 279-80 (upholding district court's relevant conduct finding where at sentencing the court adopted the facts recited in the presentence report as well as the government's argument about the significance of those facts). And a district court is authorized and even encouraged to file a later written memorandum explaining its reasoning for the sentence imposed, provided the memorandum does not change the ultimate

judgment. *United States v. Burton*, 543 F.3d 950, 953 (7th Cir. 2008); *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991).

But in this case, the court's adoption of the PSRs' findings was only a pro forma checking of a box on a pre-printed form. And the judge signed the "Statements of Reasons" a few days after he imposed the sentences. Although the adoption of a PSR's findings in this manner may suffice under a plain error standard of review, it is inadequate when reviewed for clear error. *Compare United States v. Panaigua-Verdugo*, 537 F.3d 722, 726-27 (7th Cir. 2008) (holding court did not plainly err in finding that other drug transactions were relevant conduct in absence of an explicit finding at sentencing where court in its written statement of reasons adopted the PSR and noted that the other acts were part of the same conduct as the convicted offense), *and United States v. Arroyo*, 406 F.3d 881, 889-90 (7th Cir. 2005) (finding no plain error in court's failure to make specific findings connecting uncharged drug transactions with offense of conviction where record could support the conclusion that offenses were related), *with United States v. Ortiz*, 431 F.3d 1035, 1042-43 (7th Cir. 2005) (holding court clearly erred when it failed to make specific findings on whether additional cocaine involved relevant conduct), *and United States v. Bacallao*, 149 F.3d 717, 720-21 (7th Cir. 1998) (holding court clearly erred in not making independent relevant conduct finding and instead relying entirely on the presentence report which failed to establish necessary relationship between offense of conviction and other drug transactions). The clear

error standard of review demands more of sentencing courts in terms of factual findings. *See Wilson*, 502 F.3d at 723 (relevant conduct finding not clearly erroneous where court found at sentencing that defendant had been regularly dealing cocaine and was part of an ongoing circle of dealers).

Moreover, even if the court had adopted the findings in the PSRs in this case at the time of sentencing, the court's factual findings would still be deficient on a key element of the relevant conduct analysis: the scope of the jointly undertaken criminal activity. If the court relies entirely on the PSR to make a finding as to the scope of the jointly undertaken criminal activity, the PSR must define the scope of that activity. *Cf. United States v. Singleton*, 548 F.3d 589, 590-93 (7th Cir. 2008) (upholding implicit relevant conduct finding under clear error review where court adopted the PSR's findings that detailed the defendant's regular history of drug sales over a six-year span); *Bacallao*, 149 F.3d at 720-21 (finding clear error where court failed to make independent relevant conduct finding and relied entirely on presentence report that contained insufficient factual findings). Although the PSRs in this case contain a wealth of information, their focus on the foreseeability of the conduct of others virtually ignored the scope of the joint criminal activity undertaken by each of these defendants. As stated earlier, a district court must first determine the scope of the criminal activity the defendant agreed to jointly undertake, and then determine whether the conduct of others was in furtherance of, and reasonably foreseeable to the defendant in connection with, that

activity. *Fox*, 548 F.3d at 531-32; *Thomas*, 199 F.3d at 953. Neither the PSRs nor the judge's statements at sentencing define the scope of each defendant's jointly undertaken criminal activity with sufficient clarity and specificity. A district judge may draw reasonable inferences from information in a PSR to make a finding as to the scope of the joint criminal activity undertaken by a defendant. But unstated inferences do not provide an adequate relevant conduct analysis so as to allow for meaningful appellate review. *See Harris*, 567 F.3d at 853-54 ("An appellate court's review of a sentence is for reasonableness, and the more explanation we have, the better equipped we are to assess whether an imposed sentence meets that standard.").

The government argues that the district court's findings that a group of co-schemers participated in *the* scheme and that their conduct was reasonably foreseeable to Salem and thus attributable to him were sufficient findings as to the scope of Salem's agreement to participate in the fraud scheme. Given the standard of review—clear rather than plain error—we cannot agree. The scope of the jointly undertaken criminal activity "is not necessarily the same as the scope of the entire [scheme]." U.S.S.G. § 1B1.3 cmt. n.2; *see also Fox*, 548 F.3d at 531-32 & n.7; *Soto-Piedra*, 525 F.3d at 531-32. The district court did not clearly define the scope of "the scheme" in which that group of co-schemers participated. The entire Internet fraud scheme was wide-ranging, with international dimensions, and it occurred over the course of several years and resulted in total losses to victims of approximately $6 million. The superseding

indictment alleged that the scheme involved not only the foreign co-schemers and the fourteen defendants in this case, but also "other co-schemers" who played a role like that of the defendants. The district court did not hold the defendants accountable for the full $6 million, presumably based in part on a limitation of jointly undertaken criminal activity. The finding that co-schemers participated in "the scheme" and that their conduct was reasonably foreseeable to Salem does not equate with a finding that Salem agreed to a joint undertaking that embraced the entire fraud scheme. And it is unclear whether the court's reference to "the scheme" meant the entire fraud scheme or some subset of that scheme.

The government seems to equate awareness with criminal accountability. Knowledge is not sufficient to establish the scope of the jointly undertaken criminal activity. "Even if the defendant was perfectly aware of the breadth of the scheme, if he was not part of all of it, his sentence could not be based on more than the part to which he had agreed." *Thomas*, 199 F.3d at 953. It does not necessarily follow from the fact that a co-schemer's criminal activity was reasonably foreseeable to a defendant that the defendant joined in that co-schemer's criminal activity.

We take this opportunity to remind the district courts that even where, as here, the focus at sentencing is on the reasonable foreseeability of the conduct of others, the district court still must make the necessary preliminary finding of the scope of the criminal activity that the defendant agreed to jointly undertake. The district court

neglected to make that finding in this case. And if a district court omits a finding on a key element during the § 1B1.3(a)(1)(B) analysis, the effort of an appeal could be avoided if counsel would bring such an omission to the sentencing judge's attention before the analysis is completed.

Accordingly, on remand, the district court must first determine the scope of the criminal activity that Salem, Ganescu, and Simon agreed to jointly undertake. Then, with respect to Salem, the court must determine whether the acts of Fechete, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau were in furtherance of that jointly undertaken criminal activity. Salem has not challenged the district court's finding that these co-schemers' acts were reasonably foreseeable to him. So, if the district court finds that the acts of these co-schemers were in furtherance of Salem's jointly undertaken criminal activity, then the relevant conduct findings and Salem's sentence shall stand, provided appropriate findings are made with respect to Bledea. Otherwise, the district court must re-assess its relevant conduct findings and Salem's sentence.

The government asserts that Salem waived any objection to being held accountable for the conduct of Cerna and Ianc because Salem conceded in the district court that he should be held responsible for their conduct. Salem's attorney stated at Salem's sentencing hearing that Salem was "accepting responsibility for all of the actions that he personally took part in and also [for] . . . the reasonably foreseeable actions of co-participants in the

scheme, specifically individuals such as Mr. Cerna, Mr. [Ianc]" When directly asked whether he conceded that "reasonably foreseeable conduct of others would reach to Mr. Cerna and Mr. Ianc," Salem's attorney said, "Yes." Salem cannot undo these concessions.

So, Salem argues this wasn't waiver, but forfeiture, claiming there was no strategic reason for his attorney to concede that Salem could be held accountable for Cerna's and Ianc's acts and the losses they caused. This argument is not persuasive. In *United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009), *cert. denied*, No. 09-8459, 2010 WL 85929 (U.S. Feb. 22, 2010), we reiterated: "Waiver is the intentional relinquishment of a known right, and it precludes appellate review altogether." "Forfeiture . . . is the failure to timely assert a right," which is reviewed for plain error. *Id.* We draw a distinction between waiver and forfeiture by considering whether the defendant made a strategic choice not to present an argument. *Id.* In *Garcia* we found waiver where defense counsel did not merely fail to object to the PSR's drug quantity calculation, but affirmatively stated that he knew the defendant could be sentenced for drugs trafficked by the whole conspiracy and he was not challenging drug quantity for a strategic reason. *Id.* at 542. This, we said, was "precisely what the waiver doctrine contemplates." *Id.*

Salem's counsel did not merely fail to object to the inclusion of Cerna's and Ianc's acts as relevant conduct. Instead, his counsel specifically stated that Salem was accepting responsibility for their actions. And Salem's decision to make such a concession appears to have been

strategic. *See, e.g.*, *United States v. Rosenberg*, 585 F.3d 355, 358 (7th Cir. 2009) (concluding that the defendant waived any challenge to inclusion of certain acts as relevant conduct where she chose not to object to the district court for the strategic reason that she sought a reduction for acceptance of responsibility). Salem was anticipating a reduction in his offense level for acceptance of responsibility. Had he disputed his accountability for Cerna's and Ianc's conduct, that reduction may have been in jeopardy. Thus, Salem waived the right to challenge the district court's decision to hold him accountable for the acts of Cerna and Ianc.

And after determining the scope of the criminal activity jointly undertaken by Ganescu and Simon, the district court must determine whether the acts of Ianc, Constantin, Bledea, and EM (Emanuel Matula) were in furtherance of Ganescu's and Simon's jointly undertaken criminal activity. Like Salem, Ganescu and Simon do not contest the district court's findings regarding the reasonable foreseeability to them of the acts of these co-schemers. Therefore, if the court finds that the acts of these co-schemers were in furtherance of Ganescu's and Simon's jointly undertaken criminal activity, then Ganescu's and Simon's sentences shall stand. Otherwise, the district court must reevaluate its relevant conduct findings and their sentences, with one qualification. The qualification is this: Ganescu conceded in his reply brief that he is liable "for Simon's conduct, Emanuel Matula's conduct and for whatever amounts were obtained from the currency exchanges of which Ganescu advised his co-conspirators." The district court need not reevaluate Ganescu's accountability for Simon's and Matula's conduct, but it is

unclear just what conduct is encompassed by the last phrase.

### III. Conclusion

For the foregoing reasons, we REMAND Salem's, Ganescu's, and Simon's sentences for further findings concerning the jointly undertaken criminal activity under U.S.S.G. § 1B1.3(a)(1)(B) and, if necessary, for further findings regarding the amount of the loss and the number of victims under U.S.S.G. § 2B1.1(b)(1) and (2).