In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-2533 & 10-2534

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAIMONDORAY CERNA and
MARIAN ALEXANDRU,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 923—**John W. Darrah**, *Judge.*

ARGUED JANUARY 17, 2012—DECIDED APRIL 10, 2012

Before EASTERBROOK, *Chief Judge,* and CUDAHY and
HAMILTON, *Circuit Judges.*

CUDAHY, *Circuit Judge.* This case involves defendants
who received sentences within the sentencing guideline
range but claim the court incorrectly calculated the guide-
line range.

Raimondoray Cerna and Marian Alexandru are Roma-
nian nationals who resided in the United States illegally

while participating in an international scheme to defraud online auction bidders. Individuals located primarily in Romania posed as United States-based sellers of goods on eBay and other online auction sites. A co-schemer would bid on a fabricated listing and "win" the auction. Another co-schemer would then contact a legitimate bidder, tell the bidder that the auction winner had backed out of the deal and then offer to sell the items to the bidder. Victims were instructed to send payment by wire transfer. When victims wired funds, co-schemers inside the United States, including Cerna and Alexandru, would pick up the payments using false identification. The domestic co-schemers would keep a percentage of the proceeds for themselves and send the remainder to the co-schemers in Romania. Of course, victims never received the goods for which they paid. This scheme operated for approximately two and half years, with more than 2,000 victims suffering losses totaling over $6,000,000.

Cerna oversaw and directed a number of co-schemers, including Alexandru, Gabriel Constantin, Ioan Moloman, Constantin Remus Lucan, Mihai Panaitescu, Mihail Eugen Hann, Stefan Laurentiu Dumitru, Adrian Florin Fechete, Aida Salem and Lucian Nanau, who operated in the Chicago area, Michigan and southern Florida. Cerna obtained counterfeit identification documents for this crew and relayed information between them and the co-schemers in Romania. Members of Cerna's crew kept 20% of the fraud proceeds, while Cerna was given a larger share than the other members.

Both Cerna and Alexandru have previously been deported based on their commission of criminal offenses. Cerna was convicted of fraud, for which he received a sentence reduction due to his cooperation with the government. Immediately after his deportation to Romania, however, Cerna illegally reentered the United States using a false passport that he never disclosed to the government during his earlier cooperation.

Cerna and Alexandru were both arrested in southern Florida in September 2005. Cerna was arrested on a federal warrant for illegal reentry, and Alexandru for unauthorized possession of identification under Florida law, and later for illegal reentry. Later, they were each charged with multiple counts of wire fraud. Both men pleaded guilty; Alexandru with a plea agreement and Cerna without.

At Cerna's sentencing, the district court read the presentence report and the government's version of it. The district court calculated Cerna's offense level as 21 based on: an uncontested loss amount of $1 million to $2.5 million dollars; more than 250 victims; a contested three-level role adjustment; and a three-point reduction for timely acceptance of responsibility. The three-level increase was based on the district court's finding that Cerna played a managerial role in the scheme. The district court determined that Cerna's criminal history category was V. The resulting guideline range was 168 to 210 months. After considering the sentencing factors in 18 U.S.C. § 3553(a), the court imposed a 180-month sentence.

Cerna appeals, arguing that the district court erred in its finding that he held a managerial role; that his sentence is unconstitutionally disparate from the sentences of his co-defendants; and that the court misapplied the § 3553(a) factors.

Alexandru pleaded guilty to wire fraud pursuant to a plea agreement. The pre-sentence report for Alexandru calculated a loss amount of more than $1 million and detailed his criminal past. Alexandru contested the presentence report, focusing on the loss figure. The court found that if losses attributable to co-conspirator Salem were excluded, the figure would be somewhere between $400,000 and $1 million. The district court determined Alexandru's offense level to be 26 and his criminal history category to be II. The resulting guideline range was 70 to 87 months. If the district court had concluded that Salem's losses were properly included, the offense level would have been 28, and the resulting range 87 to 108 months. After discussing the § 3553 factors, the district court sentenced Alexandru to 87 months, noting that it would have sentenced Alexandru to 87 months regardless of the guideline range.

Alexandru appeals. Though he initially argued that the district court erred in determining the scope of his relevant conduct, he withdrew this argument in his reply brief.

Lastly, both defendants argue that their sentences should be reduced due to prosecutorial delay—both defendants have been in custody since September 2005 but were not indicted on these charges until 2007.

Alexandru waived this argument by failing to raise it at sentencing. Cerna forfeited this argument because he never presented it to the district court and he has not argued that the district court's treatment of this issue amounts to plain error.

This court reviews factual findings related to the offense level for clear error. *United States v. Morales*, 655 F.3d 608, 635 (7th Cir. 2011). We review application of the Sentencing Guidelines *de novo*. *United States v. Knox*, 624 F.3d 865, 870 (7th Cir. 2010). Finally, this court reviews sentencing decisions for their reasonableness under an abuse of discretion standard. *United States v. Scott*, 631 F.3d 401, 407 (7th Cir. 2011). Since neither Cerna nor Alexandru presents a meritorious argument, we affirm both sentences.

I.

Section 3B1.1(b) of the sentencing guidelines provides a three-level enhancement if "the defendant was a manager or supervisor (not an organizer or a leader) and the criminal activity involved five or more participants." A court may consider several factors in making this determination, including: decision-making authority, nature of participation, recruitment of accomplices, claim of larger share of fruits of crime, participation in planning or organizing and the degree of control exercised by others. *See United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008). No single factor is determinative for a finding that the adjustment applies. *See United States v. Doe*, 613 F.3d 681, 687 (7th Cir. 2010).

Cerna argues that the district court failed to identify specific conduct indicating that he was a manager or supervisor. This argument is meritless. The district court pointed to four findings in the pre-sentence report to find that Cerna was a manager: (i) receiving information from foreign co-schemers regarding funds being sent by victims and distributing this information to his crew; (ii) directing his crew to receive victims' funds using a variety of aliases; (iii) obtaining counterfeit alias identification documents for co-schemers; and (iv) directing co-schemers to transmit funds to foreign co-schemers. The defendant even admitted in his plea that he held a managerial role.[1]

Cerna maintains that he ought not to receive an enhancement because he was not the only schemer with these duties. But this is immaterial; the presence of many managers does not preclude any one manager from receiving the enhancement. *See United States v. Vallar*, 635 F.3d 271, 281 (7th Cir. 2011) citing U.S.S.G. § 3B1.1, cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

Cerna raises three more issues relating to his sentence, claiming that the district court: mistakenly believed a

---

[1] It should be noted that defense counsel objected at sentencing to the adjustment, claiming that the plea declaration contained errors and should be ignored. However, Cerna had previously told the court, under oath, that he had read the declaration, discussed it with his then attorney, and had no questions about its contents.

guidelines sentence was *required*, failed to appreciate the disparate character of the sentences imposed on the various schemers and failed to address his mitigation claims. These claims are also without merit.

First, there is no evidence that the district court believed a guidelines sentence was mandatory. The district court carefully considered the § 3553(a) factors, focusing on the need for general and specific deterrence. Further, Cerna's sentence was within his guidelines range, so a lengthy explanation was not needed. *See United States v. Curby*, 595 F.3d 794, 797 (7th Cir. 2010) (citing *United States v. Harris*, 567 F.3d 846, 854 (7th Cir. 2009) ("Less explanation is typically needed with a district court sentences within an advisory guidelines range.")). In addition, the district court was not required to explicitly address every possible mitigation argument; it needed only to "demonstrate meaningful consideration of § 3553(a) factors." *Vallar*, 635 F.3d at 278 (quotations and citations omitted). Clearly the district court did so.

Second, the district court also addressed Cerna's disparity claim that he received a much harsher sentence than his co-schemers. As an initial matter, we note that because Cerna received a sentence within the guideline range, we will "assume that significant consideration has been given to avoiding unwarranted disparities between sentences." *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009). The district court explained that the cause of any apparent disparity lay in Cerna's high offense level, high criminal history category and in his not receiving a § 5K1.1 assistance reduction. The

government elected not to make a § 5k1.1 motion for Cerna because he had earlier received a deal, been deported and then immediately resumed similar offensive conduct, using aliases that he had hidden from the government. The sentences for other schemers, even those who had similar responsibilities in the scheme, were lower than Cerna's because those defendants either received cooperation reductions, had lower criminal history categories or played a smaller role in the overall scheme than did Cerna. Thus the district court did not err in issuing Cerna a more onerous sentence.

Third, Cerna's arguments for mitigation are that there was an overstatement of his criminal history, an unwarranted denial of credit for cooperation and his non-citizenship status (which exacerbated the penalty by leading to deportation). The district court expressly addressed these arguments, which are without merit. First, the criminal history of Cerna is well documented. Second, due to his eagerness to recidivate, Cerna was denied a § 5k1.1 reduction by the government. Third, the court felt the need to issue a stiff sentence to protect the public, regardless of any post incarceration consequences.

**II.**

At sentencing, Alexandru acknowledged that the criminal activity he agreed to jointly undertake included the acts of co-defendants Cerna, Moloman and Panaitescu. But he initially argued on appeal that the district court erred when it also held him responsible for the

actions of co-defendants Constantin, Ianc, Nanau, Dumitru, Lucan and Fechete. Alexandru later withdrew this argument. In any event, this argument is meritless, as the findings of the district court demonstrate.

In order to be held responsible for "foreseeable acts . . . of others in furtherance of the jointly undertaken criminal activity," as set out in Section 1B1.3(a)(1)(B) of the sentencing guidelines, the district court must find that the conduct of others was in furtherance of the joint criminal activity and reasonably foreseeable to the defendant. *United States v. Salem*, 597 F.3d 877, 886 (7th Cir. 2010). Here, it is clear that Alexandru agreed to be part of a group of individuals determined to defraud eBay users and send a share of the funds to cohorts in Romania. The district court correctly reviewed the conduct of all co-defendants and determined that Alexandru's scope of activity included the actions of all co-defendants. This was based on the similarity in the method of operation followed by all parties, the knowledge of the scope of the scheme by Alexandru (Alexandru was close to Cerna and knew he was the head of a crew of individuals), the length of time Alexandru participated in the scheme (eight to nine months) and the degree of coordination between the co-defendants and Alexandru (sharing information on exchange rates and the best Western Union offices to use; phone records showing calls between co-defendants; and obtaining false documents from the same source).

Alexandru argued that the district court erred when it failed to provide a detailed analysis of the criminal

conduct of each co-defendant as it related the district court's determination of Alexandru's scope of conduct. But this argument fails because this level of analysis is not required by statute or case law and would be manifestly impractical to pursue. The district court's analysis comports with the relatively limited approach followed by this court in *Salem*.

For these reasons, we AFFIRM the district court's sentences.