**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 13, 2012
Decided August 22, 2013

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| No. 11-1321 | |
| | Appeal from the United States District |
| UNITED STATES OF AMERICA, | Court for the Southern District of Indiana, |
| *Plaintiff–Appellee*, | Indianapolis Division. |
| | |
| *v.* | No. 1:05CR00082-005 |
| | |
| MICHAEL JACKSON, | Larry J. McKinney, |
| *Defendant–Appellant*. | *Judge*. |

**O R D E R**

Michael Jackson was sentenced to 30 years in prison after a jury found him guilty of conspiracy to possess and distribute powder and crack cocaine. *See* 21 U.S.C. §§ 846, 841(a)(1). In this direct appeal, he argues that the district court committed plain error by counting as relevant conduct drug amounts that Jackson says were not part of his jointly undertaken criminal activity. We affirm the judgment.

In 2004 police and FBI agents in Indianapolis, Indiana, began investigating a local drug-trafficking operation. During the summer of that year and into early 2005, an

undercover police officer bought approximately 510 grams of crack from Demetreous Brown in 11 separate transactions. Surveillance officers observed associates of Brown during these transactions, but no government witness was able to say that Jackson was among them. Jackson's involvement in the conspiracy was first confirmed in February 2005 (after the 11 undercover drug purchases had been completed) when a telephone call he made to Brown was intercepted on a wiretap of Brown's phone. Jackson was recorded asking Brown for an eighth of an ounce of cocaine to serve a customer.

After that first call to Brown, Jackson was intercepted numerous times in the next few months while calling Brown or Anthony Howard, another coconspirator whose phone also was tapped. His conversations with Brown and Howard demonstrate that Jackson performed a variety of supporting roles in the conspiracy. He personally facilitated drug deals (generally on behalf of Brown or Howard) aggregating more than 42 grams of crack, plus additional amounts of marijuana and powder cocaine. He frequently carried a gun, from a Glock handgun to a shotgun or "AK-47" assault rifle, and expressed a willingness to use these weapons if necessary to protect the coconspirators or retaliate against others. He also offered to locate a new cocaine supplier when the group was running low.

Police arrested Jackson in May 2005 on a traffic stop; they found a gun in his vehicle but no drugs. Jackson was on parole at the time. After his arrest the investigators intercepted phone calls between Howard and his brother (who lived in Gary, Indiana) discussing a proposed delivery from Gary of 2 or 3 kilograms of powder cocaine planned for early June. On June 1 the brothers settled on 3 kilograms. The next day two men in separate cars arrived at Howard's home in Indianapolis and delivered 3 kilograms of powder cocaine. After they had departed the residence, investigators stopped both men and found another 42 kilograms of powder cocaine in one of the cars. A search of Howard's house uncovered 123 grams of crack in addition to the 3 kilograms of cocaine.

The government charged Jackson and nine others—including Brown, Howard, Howard's brother, and the men they caught transporting the cocaine from Gary to Indianapolis—with conspiracy. The indictment alleges that the conspiracy involved at least 50 grams of crack "and/or" 5 kilograms of powder, enough to trigger a minimum prison term of ten years. *See* 21 U.S.C. § 841(b)(1)(A)(ii). Jackson was tried alone and found guilty. The probation officer recommended a base offense level of 36, based on 685.65 grams of crack and 46.539 kilograms of powder cocaine—all of the drugs attributable to the conspiracy from the inception of the undercover investigation in 2004 to the final bust in June 2005. With a two-level increase for possession of a firearm and a criminal history category of VI, Jackson's imprisonment range was 360 months to life. Despite multiple opportunities before and during the sentencing hearing, neither Jackson nor his counsel

objected to the drug-quantity calculation in the presentence report. The court adopted the calculations in the presentence report and imposed a sentence of 360 months.

On appeal Jackson contends that the district court committed plain error by counting in his drug quantity the crack from the 11 undercover buys as well as the 42 kilograms of cocaine seized from the delivery vehicle after it had departed Howard's residence on June 2, 2005. Jackson maintains that he cannot be held accountable for the undercover buys because there is no evidence that he had joined the conspiracy before the last of those 11 transactions, and he also contends that the 42 kilograms discovered in his coconspirator's car cannot be attributed to him. Jackson insists—without challenge from the government—that he would have faced a guidelines imprisonment range of 262 to 327 months, not 360 months to life, if not for the purported mistake in calculating the drug quantity. The government both defends the quantity calculation and also argues that Jackson waived this challenge by endorsing the presentence report.

Jackson concedes that he forfeited, but disputes that he waived, his objection to the quantity finding. A waived objection is unreviewable on appeal, but a forfeited contention is reviewed for plain error. *United States v. Adigun*, 703 F.3d 1014, 1021 (7th Cir. 2012). The government notes that Jackson said "no" when the district judge addressed him personally and asked if he "had any reason to dispute" the probation officer's calculation of the offense level, that his lawyer acknowledged while advocating a much lower sentence that "a black and white analysis" did yield a range of 360 months to life, and that Jackson "did not dispute" the quantity finding during allocution. But waiver must be knowing and intentional, not accidental or negligent, *see id.; United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005), and the government has not articulated a strategic reason why Jackson would forgo an objection that, if correct, would have reduced the low end of his imprisonment range by eight years. We construe the circumstances here as a forfeiture, not a waiver, and we have discretion to vacate Jackson's sentence if we find an obvious error that affects his substantial rights and also seriously impugns the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010).

At issue here are two defining principles of "relevant conduct," both recognizing that criminal responsibility for purposes of the sentencing guidelines often is narrower than liability under *Pinkerton v. United States*, 328 U.S. 640 (1946). The first principle is that a defendant is not responsible for the criminal activity that others committed before he joined their endeavor, even if he knows about that activity. U.S.S.G. § 1B1.3 cmt. n.2; *United States v. Spano*, 476 F.3d 476, 480 (7th Cir. 2007); *United States v. Diamond*, 378 F.3d 720, 726–27 (7th Cir. 2004). The second principle is that the scope of the defendant's jointly undertaken activity matters to the guidelines even if it does not under *Pinkerton*. Conspiracy liability as

defined in *Pinkerton* is "generally much broader" in scope than relevant conduct under the sentencing guidelines, *see United States v. Fox*, 548 F.3d 523, 531–32 (7th Cir. 2008); *United States v. Soto-Piedra*, 525 F.3d 527, 531–32 (7th Cir. 2008), because the latter will encompass the criminal conduct of coconspirators only to the extent that conduct was both (1) reasonably foreseeable to the defendant and (2) in furtherance of the criminal activity that the defendant agreed to jointly undertake. *See* U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n.2; *United States v. Salem*, 597 F.3d 877, 884–85 (7th Cir. 2010); *United States v. Dean*, 574 F.3d 836, 844–45 (7th Cir. 2009); *Soto-Piedra*, 525 F.3d at 531–33. Relying on these principles, Jackson maintains that the district court mistakenly attributed to him all of the drugs associated with his coconspirators.

The difficulty for Jackson's argument is the plain-error standard of review. Here the district court did not make an express finding regarding the scope of Jackson's jointly undertaken activity, but on plain-error review we will uphold the court's decision if it is clear that the court adopted the facts in the presentence report and the government's reasoning concerning those facts. *See Salem*, 597 F.3d at 888; *United States v. Panaigua-Verdugo*, 537 F.3d 722, 726 (7th Cir. 2008); *United States v. Arroyo*, 406 F.3d 881, 889 (7th Cir. 2005). We defer to the reasonable inferences that can be drawn from the record, *see Salem*, 597 F.3d at 889, and the facts support a reasonable inference that Jackson was involved in the conspiracy before he was caught on wiretap in February 2005 and that the 42 kilograms found during the June 2005 seizure were within the scope of Jackson's jointly undertaken activity.

Jackson had considerable involvement in the conspiracy's activities, as the wiretaps revealed, and he admitted that his criminal history began in 2003 when he moved from Gary to Indianapolis, where he met the other members of the conspiracy. The presentence report shows that Jackson incurred four convictions for crimes committed in Indianapolis before his 2005 arrest, although none for drug offenses. Perhaps additional facts could have shed greater light on the scope of Jackson's jointly undertaken activity within this conspiracy, but his failure to challenge the drug quantity at sentencing signaled satisfaction with the presentence report and led the government and the district court to conclude that prolonging the sentencing hearing to introduce additional evidence was unnecessary. The plain-error standard rightly makes it very difficult for a defendant to succeed on appeal when he did not make a contemporaneous objection, which would have allowed the district court to address his concerns for the first time. *See United States v. Breshers*, 684 F.3d 699, 702 (7th Cir. 2012); *United States v. Arenal*, 500 F.3d 634, 639 (7th Cir. 2007); *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998). On this record we conclude that the district court did not commit plain error in calculating Jackson's sentence.

AFFIRMED.

CUDAHY, *Circuit Judge*, dissenting.

The facts here show that Jackson was involved in a drug conspiracy in Indianapolis in 2005. These facts cannot be stretched, as the majority attempts, to speculate that Jackson joined that same conspiracy a year earlier or was part of some other undefined conspiracy with drug runners in Gary. Neither the sentencing judge nor the preparers of the PSR made any findings with regard to the scope of the defendant's activity. While I agree with the majority that plain-error is the correct standard to apply to Jackson's appeal, I disagree with the analysis that concludes that Jackson's purported importance in the conspiracy or statements regarding his so-called criminal history can provide a reasonable inference supporting a finding that he joined the conspiracy at least a year earlier than 2005. Further, these arguments have no bearing on the overall scope of the conspiracy and therefore cannot provide justification for attributing an additional 42 kilograms of cocaine to Jackson. The inclusion of these drug amounts resulted in a much higher sentencing guidelines range for Jackson, and thereby affected Jackson's substantial rights and impacted the fairness of the proceedings. In light of these deficiencies, I would vacate and remand for resentencing.

Neither the district court nor the PSR addressed plausibly how Jackson was connected to the crack and additional cocaine amounts. Thus, the PSR, without reference to evidence, notes that "[t]he defendant is responsible for the entire amount." (PSR ¶ 31.) The district court did not explicitly incorporate or explain the probation officer's calculation and instead the court relied on "a pro forma checking of a box on a preprinted form." *Cf. United States v. Salem*, 597 F.3d 877, 888 (7th Cir. 2010).[1] This lack of explanation by the district court is frustrating, especially because the two drug amounts involved required the

---

[1] I note in passing that the district court's failure to define the scope of jointly undertaken activity and the PSR's sole declarative sentence on the issue restrict the ability of this court to conduct meaningful appellate review. The majority correctly notes that *Salem* provides that a district court "may draw reasonable inferences from information in a PSR to make a finding as to the scope of the joint criminal activity undertaken by a defendant." 597 F.3d at 889. But *Salem* also counsels that "unstated inferences do not provide an adequate relevant conduct analysis so as to allow for meaningful appellate review." *Id.* The closest the district court comes to explaining its reasoning is a finding that the events of the trial "reveal a very hostile and a very violent individual who was of great assistance to this conspiracy." (Sentencing Tr. at 26.) I recognize that this case involves a more deferential standard of review than *Salem*, but even with the majority's assistance, the record does not bear out the finding of broad jointly undertaken activity advanced by the government. The error in this case is obvious and likely resulted in Jackson receiving nearly an additional decade on his sentence.

district court to make two distinct findings. In order to attribute the crack to Jackson, the district court had to determine Jackson's extent of involvement in the conspiracy – specifically, whether Jackson was a member of the conspiracy during the 2004 drug buys. In order to attribute the 42 kilograms of cocaine to Jackson, the district court had to determine the overall scope of the conspiracy – whether the extra 42 kilograms were even attributable to the present conspiracy, much less to Jackson as a member of that conspiracy. The district court seems to have touched lightly on the first matter and largely ignored the second question.

The majority's attempts to explain away these omissions are unconvincing. The majority relies on two arguments to make the case that the district court could reasonably infer that Jackson was involved in the conspiracy before he was caught on wiretap in February 2005 and that the 42 kilograms resulting from the June 2005 seizure were within the scope of Jackson's jointly undertaken activities. First, the majority notes vaguely "that Jackson had considerable involvement in the conspiracy" and second, "that he admitted that his criminal history [of undefined content] began in 2003 when he moved from Gary to Indianapolis, where he met the other members of the conspiracy." I do not see how these ill-defined "reasons" reasonably support a finding of earlier involvement or how they relate at all to the overall scope of the underlying conspiracy.

I.

The government argued, and the district court agreed, that Jackson was a great help to the conspiracy from February 2005 onward. The government supported this with references to tapped telephone calls from 2005, specifically on Feb. 26, April 10 -11, 21, 24, and 29.  These phone calls did not contain any reference to Jackson's purported involvement in 2004. The majority seems to endorse the government's speculation that Jackson might well have participated in the conspiracy even before "his first documented overt act," but speculation is not evidence. I do not see why his assistance in 2005 reasonably infers the scope of his involvement in 2004. The drug ring in this case did not exhibit a clear hierarchy of membership or ranks through which members had to rise, so substantial involvement in 2005 cannot be contorted into evidence of experience accrued in 2004.

Indeed, if we credit the government's assertion that Jackson was the primary enforcer and the "right hand man" to Howard in this conspiracy, we naturally wonder why law enforcement agents did not observe Jackson at any of the 2004 buys or catch reference

to him during that time. At trial the government's witnesses conceded that no one observed Jackson during any of the eleven 2004 transactions, and the government identified no other evidence linking him to that stage of the conspiracy. (Trial Tr., Doc. 17-1 at 55–57.) It seems unlikely Jackson could be a stealth coconspirator for an entire year while simultaneously filling such an outsized role in the conspiracy.

The majority makes much of the fact that Jackson stated that "my criminal history didn't start until 2003, till I got to Indianapolis. I did not know [the coconspirators] in Gary. I met them when I got here." (Sentencing Tr. at 20.) This statement is a country mile from an admission that Jackson was involved in the present conspiracy in 2004. The literal interpretation of the statement is that Jackson had a clean record until 2003. The majority seems to argue that the statement supports an inference that Jackson immediately joined the present conspiracy upon his arrival to Indianapolis or that because Jackson admitted that his "criminal history" began in 2003, he joined the present conspiracy soon after. But this is an exceptionally strained reading of the statement and does not line up with other evidence. The presentence report shows that Jackson incurred four convictions for crimes committed in Indianapolis before his 2005 arrest, *but none were for drug offenses*. (PSR ¶¶ 49–51.) Nothing in the presentence report indicates a link between these crimes and Jackson's coconspirators in this drug case, and no fair reading of his statement during allocution would allow for the conclusion that he was confessing to being involved in the drug ring before 2005.

II.

The district court also attributed an additional 42 kilograms of cocaine to Jackson, although this amount seems to have been destined for unknown buyers who were not even customers of the present conspiracy. Jackson contends that these drugs were instead an element of some other undefined conspiracy and are therefore outside the scope of his jointly undertaken activity under scrutiny here. The majority does not seriously address this contention. Instead, it confusingly offers arguments that have no rational relationship to this additional drug haul and it ignores all available evidence that this amount was unknown to Jackson and not destined for distribution by the present conspiracy.

Thus, I take issue with the reasonableness of the majority's arguments with respect to the 510 grams of crack. Beyond that, I do not believe there are any inferences, reasonable or otherwise, drawn from the record that would link Jackson to the 42 kilograms of cocaine. The majority claims that Jackson's importance in the conspiracy and his statement

regarding his criminal history support a finding of apparently unlimited breadth of scope of jointly undertaken conduct. But these arguments really address only the scope of Jackson's role in the present conspiracy headed by Howard and do not speak to the scope of some broader activities going beyond that.

As for the 42 kilograms of cocaine, there is no evidence that they were connected to Howard or to any of his cohorts in Indianapolis, including Jackson. The government's wiretaps provided irrefutable proof that Howard wanted 3 kilograms of cocaine, not 45 kilograms, and 3 kilograms is what Howard received before the couriers from Gary departed. The record does not reveal the intended recipients of their remaining stock, but the drug runners were stopped on their way out of Indianapolis, also heading away from Gary south on I-465,[2] and therefore *traveling away* from any of the identified members of the conspiracy. If the 42 kilograms were not even part of the present conspiracy headed by Howard, this weight cannot be attributed to Jackson based on inferences flowing from Jackson's importance or supposed earlier involvement with that conspiracy.

Both of the district court's errors—involving the 510 grams of crack and the 42 kilograms of cocaine—affected Jackson's substantial rights and impacted the fairness of the proceedings. Without the 510 grams of crack and 42 kilograms of cocaine, Jackson's guideline range would have been 262 to 327 months, instead of 360 months to life.[3] (Appellant's Br. at 25–26.) "A sentencing based on an incorrect Guidelines range constitutes plain error and warrants a remand for resentencing, unless we have reason to believe that the error in no way affected the district court's selection of a particular sentence." *United States v. Farmer*, 543 F.3d 363, 375 (7th Cir. 2008); *see also United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008); *United States v. Wallace*, 32 F.3d 1171, 1174 (7th Cir. 1994). In selecting what it thought was an appropriate sentence, the district court placed great emphasis on the "45 kilos of cocaine and cocaine base," which it described as an amount rarely seen attributed to a single person. (Sentencing Tr. at 22.) That "awful" amount of drugs would not have been considered in this case at all if the quantity had been calculated correctly.

I respectfully dissent.

---

[2] Officers made it clear that they stopped the drug runners heading away from Gary on the reasoning that "[i]f they got on the interstate and headed anywhere but back to Gary . . . there's probably more narcotics in the vehicle; that this wasn't just one trip and going home."

[3] If the court had considered only the crack or only the additional 42 kilograms of cocaine as relevant conduct, Jackson's base offense level would be lowered by two and would yield a reduced guideline range of 324 to 405 months.